IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SHAD S. EBINGER,                                    05-CV-3006-BR

       Plaintiff,                              OPINION AND ORDER

v.

JO ANNE B. BARNHART,
**Commissioner of Social
Security,**

       Defendant.


**ARTHUR WILBER STEVENS III**
Black, Chapman, Webber, Stevens, Peterson & Lundblade
930 West 8th Street
Medford, OR  97501
(541)772-9850

       Attorneys for Plaintiff

**KARIN J. IMMERGUT**
United States Attorney
**NEIL J. EVANS**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1024


1  -  OPINION AND ORDER

**MICHAEL MCGAUGHRAN**
Office of the General Counsel
**TERRYE E. SHEA**
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-2143

       Attorneys for Defendant


**BROWN, Judge.**

    Plaintiff Shad S. Ebinger brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of the Social Security Administration (SSA) denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act and Supplemental Security Income (SSI) under Title XVI of the Act.  42 U.S.C. §§ 401-433, 1381-83f.

    Ebinger seeks an order reversing the decision of the Commissioner and remanding for payment of benefits or, in the alternative, remanding for further proceedings to consider revision of his onset date and whether he was disabled for 12 months or more from September 30, 2003, the date of last insured.

    Following a thorough review of the record, the Court **AFFIRMS** the decision of the Commissioner and **DISMISSES** this matter.

2  -  OPINION AND ORDER

## ADMINISTRATIVE HISTORY

Ebinger filed an application for DIB on October 4, 2000, and applied for SSI benefits on February 20, 2001. Tr. 75-77, 384-86.[1] Ebinger alleged disability as of October 16, 1996, based on diagnoses of migraine headaches; joint affliction (variously diagnosed as inflammatory polyarthritis, palindromic rheumatism, and polyarthralgia); neck pain (cervical spondylosis with degenerative changes potentially secondary to fracture at C-2); and mental disorders (including anxiety disorder, major depressive disorder, attention-deficit hyperactivity disorder, and personality disorder). Tr. 75, 89, 93-102.

Both the DIB and SSI applications were denied on March 12, 2001, and on reconsideration on August 2, 2001. Tr. 57-61, 67-69, 388-92, 394-96. An Administrative Law Judge (ALJ) originally held a hearing on July 16, 2003, but continued the hearing to October 7, 2003, to allow for a neurological examination as to Ebinger's headaches. Tr. 409-12, 413-56. Ebinger was represented by counsel. Tr. 413. At the hearing, Ebinger; Ebinger's mother, Ruby Roberts; and a vocational expert (VE) testified. Tr. 413-56.

The ALJ issued a decision on December 5, 2003, in which he found Ebinger was not disabled within the meaning of the Social

_____

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of record filed with the Commissioner's Answer.

Security Act.  Tr. 19, 30, 32.  That decision became the final
decision of the Commissioner on December 10, 2004, when the
Appeals Council denied Ebinger's request for review.  Tr. 8-10.


## BACKGROUND

Ebinger was 32 years old at the time of the hearing.
Tr. 418.  His educational background includes completion of the
10th grade and a GED.  Tr. 418-19.  His past work experience
includes employment as dishwasher, cook, landscaper, and working
the greenchain at a lumber mill.  Tr. 95, 148-55, 419-23.

Ebinger alleges disability due to a multiplicity of
psychological and physical impairments.  The medical records as
well as Ebinger's own statements, however, indicate his
psychological impairments are secondary to any physical
impairments, all of which may be secondary to his drug/substance
abuse.

**A.   Drug and Alcohol Abuse**

Ebinger first used alcohol at age ten or eleven, and he
would drink to excess about once a month at age 15 or 16.  At age
21, he began drinking daily for about two years even while
working at the sawmill.  He continued to drink three to four
times a week thereafter.  Tr. 238.

Ebinger first tried marijuana at age eight and began regular use at age 16.  He admitted in August 2000 that "if I had my way, I'd smoke pot everyday."  Tr. 238.

As early as July 1997, doctors identified Ebinger as a possible "drug-seeker."  Tr. 233.  Ebinger himself admits to making "hospital hops" with his girlfriend to obtain narcotics. Tr. 237.

Ebinger first used methamphthetamine (meth) in 1996 and began using meth approximately three times a month in 1998.  From February 2000 until June 2000, he used meth three times per week. He told one health practitioner that his last meth use was in July 2000, but he told another health practitioner that his last meth use was in September 1999.  Tr. 238, 262-64.  Ebinger attributed some of his employment problems to his meth use. Tr. 238.

Ebinger also stated he used cocaine on ten occasions, acid six to nine times, and mushrooms twice.  Ebinger also acknowledged his misuse of muscle relaxers, tranquilizers, and pain killers beginning in 1992.  Ebinger asserted he stopped using these illegally obtained pain-killers in 1996.  Tr. 238.

**B.  Psychological and Physical Impairments**

Ebinger alleges he has suffered from migraine headaches since childhood.  The earliest medical record indicating Ebinger suffered from headaches was from November 1994 when Ebinger saw

Fred A. Griesman, M.D., because of a back injury and complained
of headaches.  Tr. 205.  Ebinger's mother confirmed migraine
headaches run in the family.

In December 1997, Ebinger was involved in a roll-over motor
vehicle accident and sustained a cervical spine C2 fracture.
Ebinger was placed in a halo device to assure proper healing.  At
that time, doctors also noted Ebinger's past medical history of
migraines.  Tr. 230-31.

During the period January through March 1998, Ebinger sought
narcotics for various symptoms including dental pain, seizure,
and headaches.  In fact, Ebinger threatened to remove the halo
device if he was not provided with narcotics.  Robert L. Masson,
M.D., notified the medical community of Ebinger's narcotic-
seeking conduct.  Tr. 197-98, 214, 217, 219, 227.

There are not any additional medical records for 1998 or
1999, and Ebinger did not begin any further medical treatment
until he applied for disability benefits.  There also are not any
mental-health treatment records as of the time of his disability
claims, but Ebinger was referred by state social services for a
consultative psychological evaluation by Psychologist Associate
Donald McArthur, MA, NCC, LPC, under the supervision of Gary
Gregor, Ph.D.

On August 11, 2000, PA McArthur interviewed and tested
Ebinger for five hours.  Ebinger attributed his loss of work in

part to his drug use.  When asked what prevented him from working, Ebinger replied, "[N]othing I could probably get a job at the sawmill today, but I don't know whether my body would allow me to last."  Tr. 236-44.

Ebinger started seeing Maciey Druzdzel, M.D., P.C., on August 15, 2000.  He had complained of generalized pain since 1995.  Dr. Druzdzel's assessment of Ebinger included general aches, suspected fibromyalgia syndrome, and headaches.  Tr. 364-66.  On September 12, 2000, Dr. Druzdzel prescribed OxyContin. The record does not reflect Ebinger informed Dr. Druzdzel of his history of drug abuse.  Tr. 363.

Dr. Druzdzel referred Ebinger to Oregon Health Sciences University (OHSU).  On September 14, 2000, Ebinger saw Alison Takeo, N.P., and Kelly D. Krohn, M.D., for evaluation.  Contrary to PA McArthur's understanding that Ebinger last used meth in July 2000, the medical staff at OHSU noted Ebinger's last meth use was one year before their evaluation.  Ebinger was diagnosed at OHSU with "inflammatory bilateral arthritis" and "some other myofascial pain."  Tr. 262-64.

Ebinger was next seen by Dr. Druzdzel on October 24, 2000. Dr. Druzdzel diagnosed "Bilateral Inflammatory Arthritis" and recommended a less physical job.  Dr. Druzdzel noted Ebinger's headaches respond to OxyContin.  Dr. Druzdzel also noted Ebinger sought a medical marijuana permit for his arthritis.  Ebinger

7  -  OPINION AND ORDER

received a medical marijuana permit and renewed it until June 2004. Tr. 440. Dr. Druzdzel reported Ebinger's mother had fibromyalgia, and his grandfather had arthritis. Dr. Druzdzel's assessment included "inflammatory polyarthritis," "fibromyalgia remains a possibility," and "worrisome headaches." Tr. 251-52.

On November 21, 2000, Ebinger saw Robert M. Bennett, M.D., Chair of the Division of Arthritis and Rheumatic Diseases at OHSU. Dr. Bennett reported it is very difficult for Ebinger to use his joints during an attack, but he is usually pain free after the episode. Dr. Bennett noted Ebinger's history is suggestive of palindromic rheumatism, and his episodic condition may eventually evolve into true rheumatoid arthritis. Dr. Bennett opined it was unlikely that Ebinger would be employable in a physically strenuous job and that he needed vocational rehabilitation.
Tr. 324-25.

On December 8, 2000, Dr. Druzdzel noted Ebinger's joint pains are "off and on," and his assessment was palindromic rheumatism and "depression possible bipolar." Tr. 362.

At a December 21, 2000, appointment, Dr. Druzdzel reported OxyContin works for Ebinger's headaches. Tr. 361.

On January 16, 2001, Dara Parvin, M.D., examined Ebinger for ongoing pain in his neck, headaches, and persistent

polyarthralgia.  Dr. Parvin noted Ebinger's long history of
migraine headaches.  Dr. Parvin also reported Ebinger's knee
x-rays were unremarkable with well-maintained joint spaces and no
loose bodies noted.  Tr. 331-34.

On February 2, 2001, Disability Determination Services (DDS)
referred Ebinger to James M. Wahl, Ph.D., for psycho-diagnostic
evaluation.[2]  Dr. Wahl noted Ebinger was applying for benefits
based on inflammatory arthritis, ADD, and depression.  Dr. Wahl
opined Ebinger appears more constrained by his physical condition
than by psychological or emotional disturbances.  Tr. 253-56.

On February 15, 2001, William J. Bernstein, Ph.D., M.D.,
P.C., of the Oregon Coast Neurology Clinic evaluated Ebinger for
headaches.  Dr. Bernstein noted Ebinger has had migraine
headaches since childhood and now asserts the headaches are
virtually always present.  Dr. Bernstein reported an MRI brain
scan was negative.  Dr. Bernstein assessed Ebinger as having a
chronic, diffuse pain syndrome of which his migraines are a
significant part.  Tr. 326-28.

On February 20, 2001, Dr. Parvin diagnosed Ebinger as
having:  1) cervical spine C2 fracture, 2) cervical spine
spondylosis with degenerative changes, and 3) a right knee injury

---

[2] DDS is a federally funded state agency that makes
eligibility determinations on behalf and under the supervision of
the Social Security Administration pursuant to 42 U.S.C. § 321(1)
and 20 C.F.R. § 416.903.

with partial posterior collateral ligament tear.  Dr. Parvin referred Ebinger to a knee specialist and also to a neurologist for his headaches.  The record does not reflect Ebinger followed up on these referrals.  Tr. 329-30.

On February 27, 2001, DDS prepared a report on Ebinger's psychological symptoms.  Ebinger's limitations were found to be mild as to restriction of daily-living activities; mild as to difficulties in maintaining social functioning; nonexistent as to difficulties in maintaining concentration, persistence, or pace; and nonconclusive as to episodes of decompensation.  There was not any evidence of the presence of the "C" criteria as described in 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00.  Tr. 273-85.

At some point, Ebinger was treated by Cindy Fox, MSW, at Curry County Human Services.  On March 1, 2001, Fox wrote a letter to "Concerned Persons" in which she stated Ebinger required his mother's assistance with medication and remembering appointments.  Fox also stated Ebinger's mental state at the time was so fragile that he was unable to take care of all of his needs at the time.  Tr. 193, 268.  On February 28, 2002, in response to Ebinger's question as to what she thought was wrong with him, Fox responded, "his primary problem was drugs.  I then told him I could do nothing about his mental or emotional problems until he faced his addictions and once sober and clean,

we could make some progress on his mental and emotional problems."  Tr. 297.

On March 9, 2001, Charles Spray, M.D., a DDS physician, reported Ebinger was able to lift/carry 20 pounds occasionally, to lift/carry 10 pounds frequently, to stand/walk about six hours in an eight-hour workday, to sit about six hours in an eight-hour workday, and to push and/or pull with no restrictions.  Dr. Spray also found Ebinger had occasional limitations with stooping, crouching, and crawling.  In addition, Dr. Spray found Ebinger was limited in handling items with his wrists due to wrist inflammation.  Dr. Spray noted Ebinger would benefit from a less physically active job.  Tr. 287-94.

On June 5, 2001, while being treated by Fox, Ebinger saw William A. Davis, D.O., also with Curry County Human Services. Ebinger's main complaint was getting "pissed off easily." Dr. Davis notes Ebinger believed PA McArthur's report "went against him" and, specifically, that PA McArthur misstated Ebinger's marijuana use when he reported it was three times a week instead of three times a month.  Dr. Davis, however, reported Ebinger had been smoking three times a week for the past two months and believed his marijuana use helped his depression and anxiety.  Dr. Davis also reported Ebinger has a marijuana permit and admits he would smoke pot on a daily basis if he could get it.  Dr. Davis noted "significant incongruities between the

11 -  OPINION AND ORDER

history that I acquired and the history that is provided by both McArthur and the assessment that is here-primarily as relates to his substance use." Tr. 309-14.

On June 29, 2001, Dr. Druzdzel noted Ebinger had not had headaches for three months. Tr. 353.

On August 31, 2001, Dr. Druzdzel noted Ebinger experiences joint pains off and on. Tr. 348. Dr. Druzdzel also prepared a "medical verification" in which she concluded Ebinger's disability began in 1994, and his length of disability was six months or more due to inflammatory polyarthritis. Tr. 349.

On December 27, 2001, Dr. Druzdzel reported the OxyContin was helping Ebinger's headaches, wrist, and knee pains. Tr. 345.

On January 17, 2002, Dr. Druzdzel switched Ebinger to Methadone from OxyContin and noted Ebinger was in "a lot of pain in the knees" and experienced "[o]ccasional headaches." Tr. 323.

On January 28, 2002, Katja Daoud, M.D., a physician at OHSU, found it was not clear whether Ebinger has inflammatory arthritis, but opined he had effusion in his knees bilaterally. Tr. 336-37.

On February 15, 2002, Dr. Druzdzel noted Ebinger's pains were stable/under control, and her assessment was palindromic rheumatism. Dr. Druzdzel also stated in a prescription note that "this patient has a very limited capacity to work and will probably be unable to work for six months." Tr. 322, 344.

12 - OPINION AND ORDER

On February 26, 2002, just 11 days later, Dr. Druzdzel concluded again in another prescription note that "this patient has a very limited capacity to work and will probably be unable to work for twelve months."  Tr. 295.

On March 15, 2002, Dr. Druzdzel reported Ebinger was homeless and had headaches "maybe weekly," and his knee pains were "stable/under control."  Tr. 320.

On April 25, 2002, Dr. Druzdzel withdrew from further professional care of Ebinger.  Tr. 317.

There are not any more medical records until October 2, 2003, when Ebinger saw Larry J. Maukonen, M.D., Southern Oregon Neurology, P.C.  Dr. Maukonen noted the MRI brain scan done on February 12, 2001, was normal, and Ebinger had gone as long as a month without a headache, but more often he has six to ten headaches a month.  Tr. 380-82.

## STANDARDS

The initial burden of proof rests on the claimant to establish disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122 (1996).  To meet this burden, a claimant must demonstrate his inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C § 423(d)(1)(A).  The Commissioner
bears the burden of developing the record.  *DeLorme v. Sullivan*,
924 F.2d 841, 849 (9th Cir. 1991).

    The district court must affirm the Commissioner's decision
if it is based on proper legal standards and the findings are
supported by substantial evidence in the record as a whole.
42 U.S.C. § 405(g).  *See also Batson v. Comm'r of Soc. Sec.
Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).  "Substantial
evidence means more than a mere scintilla but less than a
preponderance; it is such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion."  *Andrews v.
Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

    The ALJ is responsible for determining credibility,
resolving conflicts in the medical evidence, and resolving
ambiguities.  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir.
2001).  The court must weigh all of the evidence whether it
supports or detracts from the Commissioner's decision.  *Martinez
v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).  The
Commissioner's decision must be upheld even if the "evidence is
susceptible to more than one rational interpretation."  *Andrews,*
53 F.3d at 1039-40.  The court may not substitute its judgment
for that of the Commissioner.  *Batson,* 359 F.3d at 1193.

## DISABILITY ANALYSIS

**I.   The Regulatory Sequential Evaluation**

The initial burden of proof rests on the claimant to establish disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner has established a five-step sequential process for determining whether a person over the age of 18 is disabled within the meaning of the Act.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  *See also* 20 C.F.R. §§ 404.1520, 416.920. Each step is potentially dispositive.

In Step One, the claimant is not disabled if the Commissioner determines the claimant is engaged in substantial gainful activity.  *Yuckert*, 482 U.S. at 140.  *See also* 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(b).

In Step Two, the claimant is not disabled if the Commissioner determines the claimant does not have any "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41.  *See also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920©).

In Step Three, the claimant is disabled if the Commissioner determines the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 140-41. *See also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(d).  The criteria for the listed impairments known as Listings are enumerated in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments).

If the Commissioner proceeds beyond Step Three, he must assess the claimant's residual functional capacity (RFC).  The claimant's RFC is an assessment of the sustained, work-related activities the claimant can still do on a regular and continuing basis despite his limitations.  20 C.F.R. §§ 404.1545(a), 416.945(a).  *See also* Social Security Ruling (SSR) 96-8p.

In Step Four, the claimant is not disabled if the Commissioner determines the claimant retains the RFC to perform work he has done in the past.  *Yuckert*, 482 U.S. at 141-42. *See also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(e).

If the Commissioner reaches Step Five, he must determine whether the claimant is able to do any other work that exists in the national economy.  *Yuckert*, 482 U.S. at 141-42.  *See also* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(e),(f).  Here the burden shifts to the Commissioner to show a significant number of jobs exist in the national economy that the claimant can do.  *Yuckert*,

16 -  OPINION AND ORDER

482 U.S. at 141-42.  *See also Tackett v. Apfel*, 180 F.3d 1094,
1098 (9th Cir. 1999).  The Commissioner may satisfy this burden
through the testimony of a VE or by reference to the
Medical-Vocational Guidelines set forth in the regulations at 20
C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner
meets this burden, the claimant is not disabled.  20 C.F.R.
§§ 404.1520(f)(1), 416.920(f)(1).

     In this case, there is evidence that substance abuse may
play a role in the claimant's alleged disability.  If the
claimant is found to be disabled and there is medical evidence of
substance abuse, the ALJ must determine whether drug addiction or
alcoholism "is a contributing factor material to the
determination of disability."  20 C.F.R. § 416.935(a).  It is a
material factor when the claimant's remaining limitations would
not be disabling if the claimant stopped using drugs or alcohol.
20 C.F.R. § 416.935(b).  A claimant is not considered disabled if
drug addiction or alcoholism is a contributing factor material to
the determination of disability.  42 U.S.C. § 1382c(a)(3)(J).
*See also Bustamante v. Massanari,* 262 F.3d 949, 955 (9th Cir.
2001).  In such materiality determinations, the claimant bears
the burden of proving that drug addiction or alcoholism is not a
contributing factor material to the disability.  *Ball v.
Massanari*, 254 F.3d 817, 821 (9th Cir. 2001).


17 -  OPINION AND ORDER

## II.  **The ALJ's Findings**

At Step One, the ALJ found Ebinger had not been engaged in substantial gainful activity since his alleged onset date. Tr. 21, 31.

At Step Two, the ALJ found Ebinger's psychological impairments apart from the polysubstance abuse were not severe within the meaning of the Regulations.  Tr. 27.  The ALJ, however, found Ebinger's physical impairments, including a history of migraine headaches and palindromic rheumatism, were severe within the meaning of the Regulations.  Tr. 27, 31.

At Step Three, the ALJ found Ebinger's impairments were not severe enough to meet or to medically equal, either singly or in combination, one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 27, 31.  The ALJ found Ebinger has mild limitations in daily activities; social functioning; and concentration, persistence, or pace.  Tr. 13-14.  Pursuant to the DDS reports and the evidence presented, the ALJ concluded the evidence did not establish the presence of the "C" criteria. Tr. 13-14.

At Step Four, the ALJ found Ebinger is unable to perform his past relevant work because it is too physically demanding. Tr. 29.

At Step Five, the ALJ found Ebinger retained the RFC to perform a wide range of light and sedentary work.  Tr. 29.  The

ALJ also found neither the objective medical evidence nor the witnesses' testimony established that Ebinger's ability to function was severely impaired to a degree that precluded all types of work. Tr. 18-19. Based on the VE's testimony and evidence in the record, the ALJ concluded Ebinger had the RFC as well as the vocational and educational background to perform work existing in the national and regional economy such as a storage-facility rental clerk, information clerk, and surveillance monitor. Tr. 30.

## DISCUSSION

Ebinger contends the ALJ erred when he 1) rejected the opinion of Dr. Druzdzel, a treating physician; 2) rejected the opinion of PA McArthur, an examining medical practitioner; 3) improperly evaluated the combined effect of Plaintiff's impairments; 4) rejected the lay testimony of Plaintiff's mother, Ruby Roberts; 5) rejected Plaintiff's subjective-symptom testimony; and 6) disregarded the VE's response to one of the hypotheticals.

In addition, Ebinger requests the Court to amend the onset date of his disability to 12 months or more from his last date insured, September 30, 2003. The record, however, reflects the ALJ considered all medical evidence and testimony from the original onset date of October 16, 1996, through October 2, 2003.

19 -  OPINION AND ORDER

Amending the onset date, therefore, would not change the outcome of the ALJ's analysis. Accordingly, the Court need not address this issue.

**I.   Dr. Druzdzel's Opinion**

Ebinger contends the ALJ improperly rejected the opinion of Dr. Druzdzel, his treating physician.

It is well-settled that "greater weight is afforded to the opinion of a treating physician than to that of [a] non-treating physician, because the treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Ramirez v. Shalala*, 8 F.3d 1449, 1453 (9th Cir. 1993)(internal quotations omitted). A treating physician's opinion is controlling when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent" with other evidence in the record. 20 C.F.R. § 404.1527(d)(2).

When an ALJ does not give a treating physician's opinion controlling weight, the ALJ must give "specific, legitimate reasons" for rejecting it if that opinion conflicts with another physician's opinion or with evidence in the record. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). When the opinion of the treating physician or other medical expert is uncontroverted, the ALJ must give "clear and convincing reasons" before rejecting such an opinion. *Id. See also Lester v. Chater*, 81 F.3d 821,

830-32 (9th Cir. 1995).  The ALJ also must give "specific,
legitimate reasons" for rejecting the opinion of an examining
physician when that opinion conflicts with another physician's
opinion or with evidence in the record.  *Magallanes v. Bowen*, 881
F.2d 747, 751 (9th Cir. 1989).  The ALJ may properly reject a
physician's opinion regarding disability when it is premised on
the claimant's own subjective complaint of disabling pain that
the ALJ already has discounted.  *Fair v. Bowen*, 885 F.2d 597,
605 (9th Cir. 1989).  Disability is not a determination to be
made by a physician, but rather the issue is reserved to the
Commissioner.  SSR 96-5p.

     As noted, Dr. Druzdzel, prepared a medical verification on
August 31, 2001, in which he explained Ebinger was unable to work
for "six months or more" due to inflammatory polyarthritis that
began in 1994.  Tr. 349.  On February 15, 2002, and February 26,
2002, Dr. Druzdzel prepared "To Whom It May Concern"
prescriptions in which he stated Ebinger "has a very limited
capacity to work and will probably be unable to work" for six to
12 months.  Tr. 295, 344.  The ALJ, however, found Dr. Druzdzel's
opinions were entitled to little weight because the doctor's own
records generally indicate Ebinger's joint pains were only an
"off and on" issue.  Furthermore, the ALJ found the doctor's
statements were "generalized and vague, essentially issuing a
vocational (non-medical) conclusion of 'disability,' which is an

issue reserved to the Commissioner." The ALJ also found Dr. Druzdzel's "durational projections are inconsistent and appear to be random." *See* SSR 96-5p. *See also Fair*, 885 F.2d at 605. The ALJ, therefore, concluded Dr. Druzdzel's statements "to be more a form of patient advocacy than objective evaluation or functional assessment." Tr. 29.

Based on this record, the Court concludes the ALJ did not err when he rejected and/or discounted the opinion of Dr. Druzdzel because the ALJ provided legally sufficient reasons supported by substantial evidence in the record for doing so.

## II. PA Donald McArthur's Opinion

Ebinger asserts the ALJ erred when he rejected the opinion of PA McArthur, examining psychologist associate, as an unacceptable medical source.

The ALJ has a duty to consider any medical opinions that are statements from "acceptable" medical sources and from "other" medical sources that reflect judgments about the nature and severity of the claimant's impairments and resulting limitations. 20 C.F.R. §§ 404.1527, 416.927. The weight to be assigned a medical opinion, including those rendered by treating, examining, and nonexamining physicians, depends on how well the opinions are supported by objective evidence and are consistent with the record as a whole. 20 C.F.R. §§ 404.1527, 416.927. "Acceptable" medical sources are individuals, rather than teams, and the

report of an interdisciplinary team should not be considered an "acceptable" medical source.  20 C.F.R. §§ 404.1513, 416.913.

Ebinger argues the ALJ improperly credited the opinion of Dr. Wahl, who only spent one hour evaluating Ebinger, and yet the ALJ rejected PA McArthur's opinion, who spent five hours evaluating Ebinger.

State social services referred Ebinger to PA McArthur for a consultative psychological evaluation under the supervision of Gary Gregor, Ph.D.  PA McArthur assessed Ebinger as having a moderate degree of restriction as to activities of daily living and social functioning; a frequent degree of restriction on concentration, persistence, and pace; and a frequent degree of restriction as to work activities.  Tr. 243.  PA McArthur opined Ebinger suffered from a "major depressive disorder"; "attention deficit hyperactive disorder"; and "polysubstance dependence in full, partial remission by self-report."  Tr. 243.  PA McArthur noted Ebinger's drug use contributed to his psychological impairment, but opined Ebinger's psychological problems are independent of his drug use.  Tr. 243.

The ALJ found PA McArthur's conclusions unconvincing because they were inconsistent with the record as a whole and with his own report.  PA McArthur's conclusions also were contradicted by Dr. Wahl's assessment in which he addressed their differing conclusions.  The ALJ also noted PA McArthur is not a licensed

psychologist, an acceptable medical source under the Regulations, or a treating source, all of which reduce the weight to which PA McArthur's opinion is entitled.  Tr. 26.  Moreover, Ebinger acknowledged to both PA McArthur and to Dr. Wahl that he would be able to work if not for his physical problems.

Based on this record, the Court finds the ALJ gave appropriate weight to PA McArthur's opinion considering the contradictions and inconsistencies in the medical reports and PA McArthur's position as a nontreating and unacceptable medical source under the Regulations.  In addition, the ALJ noted Ebinger admits migraine headaches and episodic joint pain rather than psychological limitations are the primary basis for his claim.

Accordingly, the Court finds the ALJ did not err when he discounted PA McArthur's opinions because he gave legally sufficient reasons support by substantial evidence in the record for doing so.

### III. __The ALJ's Evaluation as to the Combined Effect of Plaintiff's Impairments__

In Step Two of the five-step analysis, the claimant is not disabled if the Commissioner determines the claimant does not have any "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41.  *See also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920©).  Ebinger argues the ALJ should have found the combined effect of Ebinger's impairments resulted

in limitations equal in severity to those specified under the Listed Impairments.

The ALJ made an exhaustive evaluation of Ebinger's psychological and physical impairments.  There was substantial evidence showing Ebinger suffered from only a mild psychological impairment.  In fact, PA McArthur in August 2000, Dr. Wahl in February 2001, and Ebinger himself during his testimony at the hearing stated Ebinger was mentally able to work.  Tr. 236-44, 253-56, 441.

As noted, the ALJ found Ebinger, apart from his polysubstance abuse, does not have a psychological impairment that is severe.

Although the ALJ found Ebinger's physical impairments were severe, the medical evidence showed Ebinger's arthritic condition was relatively benign except for the inconsistent effusion found in his knees, and the neurological evaluations for Ebinger's migraines, including a brain MRI, were consistently "negative." Thus, even though the ALJ concluded Ebinger's migraines and palindromic rheumatism are severe within the meaning of the Regulations, he found they are not severe enough to meet or to medically equal one of the Listed Impairments.

After considering Ebinger's severe and nonsevere impairments in combination, the ALJ concluded Ebinger had an RFC consistent

with an ability to perform a wide range of light and sedentary work.

Based on this record, the Court finds the ALJ properly considered all of Ebinger's alleged impairments and did not err when he concluded their combined effect was not equal in severity to those specified under the Listed Impairments.

## IV.    **Ruby Roberts's Testimony**

Ebinger asserts the ALJ erred when he rejected the lay-witness testimony of Ebinger's mother, Ruby Roberts, without providing germane reasons specific to her.

The ALJ may reject testimony from lay witnesses but must give reasons that are germane to each witness. *Smolen v. Chater*, 80 F.3d 1273, 1288-89 (9th Cir. 1996).

The ALJ accepted Roberts's testimony "only to the extent that it is consistent with the conclusions herein" for the reasons previously described regarding the absence of evidence to establish Ebinger's psychological and physical impairments. Tr. 28.  The ALJ noted Roberts testified she sees her son "off and on," and he recently lived with her.  The ALJ, however, inexplicably stated Roberts "failed to mention any pain issues whatsoever."  She, in fact, testified her son was unable to work because of social anxiety, migraines, and overwhelming depression.  Tr. 26.  She also testified she believed Ebinger could not work in part because of "[h]orrible, horrible

migraines." Tr. 450.  She stated she heard her son in the
bedroom experiencing such pain from his migraines that he was
"rolling, and crying and holding his head." Tr. 450.  Roberts's
testimony as well as her written statements clearly refer to
Ebinger's pain and his inability to function because of that
pain.

Nonetheless, the Court finds the ALJ's misstatement is not
material to his analysis because the ALJ, in fact, acknowledged
Ebinger has migraines and joint pain and found these physical
limitations to be severe.  Tr. 27.  In the end, the ALJ properly
discounted Roberts's testimony for the same germane reasons that
he rejected Ebinger's subjective complaints; namely, in light of
Ebinger's substance abuse, the medical evidence, and the
witnesses' testimony, the record did not support Ebinger's
allegations of subjective physical and psychological limitations
sufficient to find him disabled.  Tr. 28.

Accordingly, the Court finds the ALJ did not err when he
discounted Roberts's testimony because he gave legally sufficient
reasons supported by substantial evidence in the record for doing
so.

**V.   <u>Plaintiff's Testimony</u>**

Ebinger contends the ALJ erred because he failed to give
specific reasons for finding Plaintiff's testimony not fully
credible.

"If the ALJ finds that the claimant's testimony as to the severity of [the claimant's] pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).  When weighing the claimant's credibility, the ALJ may consider "inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Thomas,* 278 F.3d at 958.

Here the ALJ identified several inconsistencies between Ebinger's testimony and the medical record.  The ALJ also considered the role of substance abuse as a limiting factor.  As a result, the ALJ found Ebinger's subjective complaints regarding the nature and extent of his functional restrictions not fully credible.  Tr. 28.

As noted, the diagnosis for Ebinger's diffuse musculoskeletal pains were uncertain even though the medical consensus supported an inflammatory condition.  Physical

examinations were relatively benign except for some effusion found in the knees.  Ebinger shifted his emphasis from constant full-body pain due to arthritis to migraine headaches of a frequency and duration that he alleges is disabling.  His statements, however, are not fully supported by the record.  For example, there are only minimal references to any headache issues before 2001, and neurological evaluations and other work-ups including a brain MRI were consistently "negative."

The ALJ also considered all of Ebinger's unsubstantiated subjective symptoms in the context of Ebinger's significant substance abuse and his history of drug-seeking behavior.  The ALJ properly cautioned against accepting Ebinger's complaints at face value, particularly in light of the fact that his headaches and joint pain were bases for trying to obtain narcotic pain medication in the past and in light of the inconsistency and inconclusiveness of the medical evidence.  In any event, the record suggests Ebinger's substance-abuse problems appear to be the primary barrier to his sustained employment.  Tr. 28.

In summary, the Court finds the ALJ adequately explained his reasons for finding Ebinger not fully credible as to the intensity, persistence, and limiting effects of his condition as they pertain to his ability to work.  The Court, therefore, concludes the ALJ did not err because he provided a legally

sufficient basis supported by substantial evidence in the record
for finding portions of Ebinger's testimony not credible.

## VI.  <u>Hypothetical Questions to the VE</u>

Ebinger contends the ALJ erred when he based his decision on
the VE's response to an incomplete hypothetical that failed to
accurately reflect Ebinger's condition and when he disregarded
the VE's answer to hypotheticals that reflected Ebinger's actual
condition.

The Commissioner must show the claimant can do other work
that exists in the national economy in order to satisfy Step Five
of the sequential analysis.  *Andrews v. Shalala*, 53 F.3d 1035,
1043 (9th Cir. 1995).  The Commissioner may satisfy this burden
by eliciting the testimony of a VE with a hypothetical question
that sets forth all of the claimant's limitations.  *Id.*  The
assumptions in the hypothetical question must be supported by
substantial evidence in the record.  *Id*.

Ebinger testified he has not been able to work for the past
three years because he would miss approximately three to four
days of work a month due to his migraines.  Tr. 446.

The ALJ's first hypothetical to the VE included age,
education, and past work experience similar to that of Ebinger

with the limitations of lifting, stooping, crouching, and
crawling as determined in the ALJ's RFC.  Tr. 452-53.  The VE
opined such an individual would not be able to perform Ebinger's
past relevant work, but he would be able to work as a storage-
facility rental clerk, an information clerk, or a surveillance-
system monitor.  Tr. 452-53.  When the ALJ posed a hypothetical
to the VE that the person likely would miss three days of work or
more per month, the VE opined the individual would be ruled out
of competitive employment.  Tr. 453.  Further hypotheticals from
Ebinger's counsel resulted in the same conclusion from the VE.
Tr. 454-55.

As noted, however, the ALJ reasonably relied on the VE's
response to the hypothetical that actually mirrored the
limitations supported by the medical evidence in the record and
that were reflected in the ALJ's RFC assessment.

Accordingly, the Court concludes the ALJ did not err when he
relied on the hypothetical posed to the VE that reflected all of
Ebinger's potential functional limitations as set out in the
ALJ's RFC assessment and that were reasonably supported by
substantial evidence in the record.

**CONCLUSION**

For these reasons, the Court **AFFIRMS** the Commissioner's decision and **DISMISSES** this matter.

IT IS SO ORDERED.

DATED this 7th day of June, 2006.


/s/ Anna J. Brown
_____
ANNA J. BROWN
United States District Judge

32 - OPINION AND ORDER